UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

NICOLE LARSON,

          Plaintiff,

    v.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

          Defendant.

6:13-cv-01096-ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

      Plaintiff, Nicole Larson ("Larson"), seeks judicial review of the final decision by the

Social Security Commissioner ("Commissioner") denying her application for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 USC

§§ 401-33.  This court has jurisdiction to review the Commissioner's decision pursuant to

42 USC § 405(g) and § 1383(c)(3).  For the reasons set forth below, that decision should be

reversed and remanded for an award of benefits.

1 - FINDINGS AND RECOMMENDATION

## ADMINISTRATIVE HISTORY

Larson protectively filed for DIB on September 29, 2008, alleging a disability onset date of May 2, 2007.  Tr. 146–47.[1]  After her application was denied initially and on reconsideration, she requested a hearing.  Tr. 90–110.  On February 18, 2011, a hearing was held before Administrative Law Judge ("ALJ") Michael Gilbert.  Tr. 32–89.  The ALJ issued a decision on September 23, 2011, finding Larson not disabled.  Tr. 12–25.  After receiving additional evidence, the Appeals Council denied a request for review on April 25, 2013.  Tr. 1–8.  Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court.  20 CFR §§ 404.981, 422.210.

## BACKGROUND

Born in 1965, Larson was 45 years old at the time of the hearing before the ALJ.  Tr. 38.  After graduating from high school, she completed a vocational certification to become a nurse assistant and has past relevant work experience as a daycare worker, certified nurse assistant ("CNA"), and foster parent.  Tr. 40–41, 244.  Larson alleges that she has been unable to work since May 2, 2007, due to the combined impairments of muscle control failure, extreme weakness, headaches, depression, insomnia, forgetfulness, and inability to concentrate.  Tr. 162.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

---

[1]  Citations are to the page(s) indicated in the official transcript of the record filed on June 10, 2014 (docket #12).

than 12 months." 42 USC § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR § 404.1520; *Tackett v. Apfel*, 180 F3d 1094, 1098–99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR § 404.1520(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR § 404.1520(a)(4)(ii) & (c). Absent a severe impairment, the claimant is not disabled. *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR § 404.1520(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 ("Listing of Impairments"). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR § 404.1520(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR § 404.1520(a)(4)(iv) & (e). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at 1099; 20 CFR § 404.1520(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180

F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show

that jobs exist in the national economy within the claimant's RFC.  *Id*.  If the Commissioner

meets this burden, then the claimant is not disabled.  20 CFR § 404.1520(a)(4)(v) & (g).

## <u>ALJ'S FINDINGS</u>

After finding that Larson meets the insured status requirements of the SSA through

December 31, 2012, the ALJ concluded at step one that Larson has not engaged in

substantial gainful activity since May 2, 2007, the alleged onset date.  Tr. 14.

At step two, the ALJ determined that Larson has the severe impairments of major

depressive disorder, somatoform disorder, [2] morbid obesity, and headaches.  *Id*.

At step three, the ALJ concluded that Larson does not have an impairment or

combination of impairments that meets or equals any of the listed impairments.  Tr. 16.  The

ALJ found that Larson has the RFC to perform less than the full range of light work.  Tr. 17.

She can frequently lift or carry 10 pounds; stand or walk for about 6 of 8 hours and sit for

up to 6 out of 8 hours; occasionally lift and carry 20 pounds; is limited to simple, routine,

repetitive tasks with no greater than reasoning level 2; and can have no more than

occasional interaction with the public or coworkers due to focus upon somatic complaints.

*Id*.

Based upon the testimony of a vocational expert ("VE"), the ALJ determined at step

four that Larson's RFC precluded her from returning to her past relevant work.  Tr. 23.

---

[2]  A somatoform disorder is defined as "any of a group of psychological disorders (as body dysmorphic disorder or hypochondriasis) marked by physical complaints for which no organic or physiological explanation is found and for which there is a strong likelihood that psychological factors are involved." MERRIAM WEBSTER, http://www.merriam-webster.com/medlineplus/somatoform%20disorder (last visited Feb. 5, 2015).

At step five, the ALJ found that considering Larson's age, education, and RFC, she was capable of performing the job of small products assembler and, if limited to the full range of sedentary work, was capable of performing the jobs of final assembler and addresser.  Tr. 24.

Accordingly, the ALJ determined that Larson was not disabled at any time through the date of the decision.  Tr. 25.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of the Commissioner. *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir 2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'"  *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004); *see also Lingenfelter*, 504 F3d at 1035.

## FACTUAL AND MEDICAL BACKGROUND

In June 2007, after leaving her job as a CNA and losing her insurance, Larson established care with Lyle Torguson, M.D.  Tr. 318–21.  Over three visits on June 15

(Tr. 320–21), July 16 (Tr. 318–19), and September 7, 2007 (Tr. 316–17), Dr. Torguson assessed that Larson was "very complicated medically and psychiatrically" (Tr. 321), with a "number of symptoms and chronic conditions that . . . elude[] the [*sic*] definition or identification. The symptoms include muscle weakness and tremors as well as shaking of the arms and legs at times." Tr. 316. Although many of Larson's prior doctors had diagnosed fibromyalgia, Dr. Torguson observed that Larson has "many symptoms including muscle weakness that ha[ve] nothing to do with fibromyalgia" and noted that she had never had a "complete workup" to diagnose her symptoms. *Id.* Dr. Torguson referred her to Beth Blumenstein, M.D., for primary care, but would continue to see her for psychiatric symptoms when she got insurance. Tr. 318, 321.

On January 31, 2008, Larson established care with Dr. Blumenstein and reported that after experiencing muscle weakness since she was young, her "legs are now giving out on her" and she was "shaky and has tremors at times." Tr. 306. Dr. Blumenstein suggested she see a physical medicine rehabilitation doctor (physiatrist). *Id.* Dr. Blumenstein also prescribed Lyrica as a trial for fibromyalgia, although she was not "exactly sure that [Larson] has fibromyalgia," and asked Larson to return for a full physical exam, which she did on February 14, 2008. Tr. 302–304 (Feb. 14), 306–07 (Jan. 31).

On April 8, 2008, physiatrist Gregory M. Phillips, M.D., began treating Larson. Tr. 272–74; 351–56, 380. Larson reported she had developed polio myelitis as a child causing balance and walking issues which had stabilized in her twenties, but deteriorated in her thirties. Tr. 272. She now experienced trembling in her hands and legs, easy fatigue, constant neck and low back pain (ranging from a level 3 to a 10, on a 1 to 10 scale), and headaches. *Id.* Dr. Phillips's testing found a full range of motion, normal muscle tone with

no atrophy, intact sensory response, minimal upper body swing with an otherwise normal gait, and 5/5 strength bilaterally in upper and lower extremities, but she fatigued relatively easily in her lower extremities with sustained muscle contractions.  Tr. 274.  The fibromyalgia exam was negative, and he diagnosed postpolio syndrome (late stage effects of polio), migraine headaches, and mechanical neck and low back pain without evidence of radiculopathy.  Tr. 274–75.  He continued Fiorinal for headaches, started Cymbalta for her pain, and instructed her to discontinue Lyrica if she noticed increased muscle weakness. Tr. 275.

On May 6, 2008, Dr. Phillips substituted Wellbutrin for Cymbalta which was making Larson tired, started a trial of Topamax for headaches, and referred her to rehabilitation medicine specialist, Victor K. Lin, M.D., for postpolio treatment.  Tr. 349.

On May 22, 2008, Dr. Line performed a neurological and cerebral function examination which was normal.  Tr. 339–41.  Dr. Lin opined that Larson's "clinical picture does not fit post polio in many respects" but "myasthenia gravis/Lambert-Eaton syndrome, even multiple sclerosis or some muscular dystrophies" might fit, and he did not feel that she displayed "the classic presentation of fibromyalgia."  Tr. 342.  He referred Larson to a neurologist to perform EMG/nerve conduction studies.  *Id.*

On July 1, 2008, Larson reported improvement to Dr. Phillips in her pain and migraines with physical therapy, but continued fatigue.  Tr. 348.

On October 13, 2008, neurologist Michael Balm, M.D., conducted an EMG/NCS (Tr. 336–38) which was normal, "failing to demonstrate evidence of this patient ever having poliomyelitis or any other polyradiculopathy, myopathy, or polyneuropathy."  Tr. 334. Dr. Balm could not "find evidence of primary neurological disease" and concluded that her

condition likely represents "a form of chronic fatigue syndrome or fibromyalgia syndrome."
*Id.* He also diagnosed vitamin D deficiency and prescribed a supplement. Tr. 334, 447.

On October 28, 2008, after reviewing Dr. Lin's assessment, Dr. Phillips stated he
was "not sure why [Larson] had this progressive loss in her function" but still thought it was
"related to her late effects of polio." Tr. 345. He asked Larson for permission to present
her case to "some very well respected attending physicians." *Id.* On November 11, 2008,
after reviewing Dr. Balm's assessment, Dr. Phillips kept his diagnosis of postpolio
syndrome and opined that Larson would "benefit from single fiber EMG versus
somatosensory evoked potentials or muscle biopsy." Tr. 344. He also obtained a release
from Larson for records from the hospital where she was treated as a child, as he was
"interested in finding out what her doctor's take was on her symptoms." *Id.*

On December 23, 2008, Larson returned to Dr. Phillips with her mother who stated
that Larson had been "diagnosed with polio at the age of 11 months and spent one week in
the hospital," after which she was given "the attenuated polio vaccine," "had ataxia [lack of
voluntary coordination of muscle movements] and equilibrium issues for several months
after the onset[,] . . . was diagnosed with cerebellar dysfunction" by Dr. Senz, and was
"presented at a conference." Tr. 389. Dr. Phillips had not received any medication
documentation from the hospital where Larson was treated as a child, but considered
referring Larson to a rheumatologist[3] or neurologist at Oregon Health and Sciences
("OHSU") or University of Washington. Tr. 389. He noted Larson had "some cerebellar
issues" and ordered an MRI of her brain. *Id.*

---

[3] Dr. Torguson later reported that at some point Larson saw a rheumatologist "who did not feel that she had any rheumatologic problems." Tr. 566.

On December 31, 2008, consulting psychologist Alison Prescott, Ph.D., examined Larson. Tr. 411–415. Larson reported she had never received mental health services for depression or anxiety but had experienced depression with her physical conditions for the past three to four years. Tr. 412. Dr. Prescott observed some impairment with concentration and diagnosed major depressive disorder and factors typical of a somatoform condition called neurasthenia, "which presents a mix of depression and somatoform symptoms such as fatigue and weakness." Tr. 413–14.

On January 3, 2009, Larson saw Dr. Torguson because she wanted "some straight answers from a doctor she trusts." Tr. 444. He "explained all the conditions that might be concerning" and advised her that she would return for a repeat MRI scan of her brain. Tr. 445.

On January 26, 2009, consulting psychiatrist Kordell N. Kennemeyer, Psy.D., reviewed Larson's records and diagnosed major depressive disorder and somatoform disorder. Tr. 419–31.

On January 27, 2009, Dr. Phillips discussed with Larson the results of her brain MRI (Tr. 391) taken on January 5, 2009, which indicated a small area in the splenium of the corpus callosum that could be a demyelinating lesion. Tr. 437. Dr. Phillips recommended spinal puncture with a test for oligonclonal bands to rule out multiple sclerosis and a return to Dr. Balm, but according to Larson, Dr. Balm's assistant "stated there was no reason for her to see Dr. Balm."[4] *Id.* Dr. Phillips offered to refer her to neurologist George Craft, M.D., but Larson asked for time to talk the next step over with Dr. Torguson. *Id.*

---

[4] As reported later by Dr. Torguson, at some point Larson received a lumbar puncture to rule out multiple sclerosis. Tr. 566.

On January 28, 2009, J. Scott Pritchard, D.O. reviewed Larson's records and determined that she did not have a severe physical impairment and suffered from a somatoform disorder and not a physical etiology.  Tr. 443.

On April 2, 2009, Dr. Phillips provided a Medical Statement Regarding Postpolio Syndrome for Social Security Disability Claim, stating that Larson suffered from fatigue, motor weakness, joint pain, muscle pain, concentration deficiencies, and moderate to severe pain.  Tr. 509.  In his opinion, Larson could only work one hour per day, stand for 15 minutes at one time and less than 60 minutes in a workday, sit for two hours at one time and four hours in a workday, lift 20 pounds occasionally and ten pounds frequently, frequently manipulate, and occasionally stoop and bend.  Tr. 509–10.

On June 2, 2009, consulting psychiatrist Paul Rethinger, Ph.D., affirmed Dr. Kennemeyer's assessment, and Sharon B. Eber, M.D., affirmed Dr. Pritchard's assessment.  Tr. 456-57.[5]

On August 28, 2009, Larson saw Dr. Torguson about the second brain MRI which was taken on July 1, 2009.  Tr. 428–29, 460.  She reported that she could not see the neurologist Dr. Phillips referred her to because she did not have insurance.  Tr. 460.  She reported difficulties walking, fluctuating "from not being able to walk or perform at all to walking in general poorly."  Tr. 461.  Dr. Torguson opined that Larson was "totally disabled" and prescribed a prednisone burst to mitigate her symptoms and help with diagnosis.  *Id.*

---

[5] Dr. Rethinger and Dr. Eber affirm assessments written on January 29, 2009.  However, Dr. Kennemeyer wrote his assessment January 26 and Dr. Pritchard wrote his on January 28, 2009.

On September 29, 2009, Dr. Torguson reported that the prednisone test "worked fantastic. She almost got her life back again for the 1 week that the benefits of the prednisone was on board. She was able to walk better and talk better. She was able to have more energy and actually had better focus and concentration." Tr. 458. But Larson regressed after the prednisone wore off with difficulties walking, talking, and visualizing. *Id.* Dr. Torguson stated that "there is no doubt in my mind that [Larson] is disabled, either physically or psychiatrically or both" and stressed the need for a neurologist to assess the meaning of prednisone's efficacy. Tr. 459.

On January 10, 2010, Larson reported to Dr. Torguson that she had muscle spasms in her back and multiple aches and pains in her upper body that did not respond to anti-inflammatories, but she was taking vitamin D supplements regularly. Tr. 514. Dr. Torguson observed fibromyalgia tender spots in her neck, arms, and shoulder — all above the waist. Tr. 515. He prescribed Flexeril for her pain but decided "not to go down the chronic pain path even though nothing seems to work for her painful body." *Id.* He told Larson to report back when she got insurance because he wanted to conduct a pulmonary function test and an ultrasound on her upper right hand quadrant. *Id.*

On June 14, 2010, Dr. Torguson noted that the muscle relaxer and Flexeril did not ease Larson's pain but her depression medication was working. Tr. 512. Dr. Torguson prescribed Vicodin "for the patient's own good and a lack of objective need for Vicodin" and referred her to OHSU. Tr. 513.

On August 20, 2010, Dr. Torguson submitted a Medical Statement Regarding Physical Abilities and Limitations. Tr. 526–27. He diagnosed generalized motor weakness and organic brain trauma and assessed Larson as limited to working for one to two hours in

a workday, standing for 15 minutes at one time and for 60 minutes in a workday, sitting for two hours at one time and two hours in a workday, lifting ten pounds occasionally and five pounds frequently, occasionally bending, never stooping or bending, and frequently manipulating with both hands at any height.  Tr. 526.

On June 7, 2011, DeWayde C. Perry, M.D., examined Larson for 40 minutes. Tr. 543-48.  Larson explained that "nothing in particular worsens her pain; it is just random."  Tr. 544.  Dr. Perry observed Larson had a normal gait but "with occasional giving away of one of the lower extremities.  [Larson] did not fall completely but did stumble." Tr. 545–46.  Larson used a cane which Dr. Perry assessed as "medically necessary based on objective findings for stability for all distances and terrain," though "not prescribed but allegedly recommended by her physician."  Tr. 546–47.  In Dr. Perry's opinion, Larson's sitting manipulative capacity is not limited, but her maximum standing and walking capacity is four hours.  Tr. 547.

On August 11, 2011, Larson had another MRI scan of her brain  which showed positive lesions. Tr. 561–62.

On December 15, 2012, after the ALJ issued his decision but before the Appeals Council denied review, Larson began treatment with neurologist David E. Lippincott, M.D. Tr. 572.  He ordered an MRI of her cervical spine which was performed on December 19, 2012.  Tr. 572–74, 577–80.  The spinal MRI showed a "flattening of the cervical curve and in fact a wild reversal of her cervical curve," "significant degenerative disk disease at C5-6 and C6-7," and "moderate central stenosis at C5-6 with flattening of the cervical cord," but no "abnormal signal in the cord."  Tr. 570.  It also showed moderate stenosis at C6-7 which was "more pronounced on the right side due to an asymmetric osteophytic formation."  *Id.*

Based on the MRI and his examination, Dr. Lippincott diagnosed Larson on January 10, 2013, with "[c]ervical spondylosis with a moderate central stenosis in C5-C-6 and C6-C7" and stated his belief "that she does have a symptomatic cervical myelopathy" based on her "4-limb clumsiness and gait instability."[6] Tr. 571. He recommended a neurosurgical evaluation, but opined that she was not "putting herself at significant risk by not having surgery. . . . The central stenosis is going to progress and as it does so, she will become more symptomatic and likely more compelled to seek surgical treatment." *Id.* Larson did not think she could afford surgical intervention at that time. *Id.*

Dr. Lippincott also reviewed Larson's brain MRI (Tr. 580–81) and identified the area of "increased T2 signal in the periventricular white matter" as an isolated finding. Tr. 571. He did not believe "that multiple sclerosis is an issue" based on the absence of "multiple lesions in her brain and perhaps on her spinal cord as well" after 15 years of symptoms. *Id.*

## **FINDINGS**

Substantial evidence reveals that since at least May 2, 2007, Larson has complained of weakness, especially in her legs, fatigue and pain. Through the date of the ALJ's decision, Larson's medical providers mentioned possible causes of her complaints which they found credible, but were unable to make a definitive diagnosis. However, in January 2013, after the ALJ issued his decision but before the Appeals Council denied review, Larson finally received a diagnosis of a neurological condition to explain her symptoms.

---

[6] "Cervical stenosis is a slowly progressive condition that pinches the spinal cord in the neck. Cervical myelopathy refers to this compression of the cervical spinal cord as a result of spinal stenosis. . . An MRI scan and/or a CT with myelogram can show the tight canal and spinal cord pinching associated with myelopathy from stenosis of the cervical spine. The spinal stenosis may be present at one or several levels in the cervical spine. Often, cervical stenosis with myelopathy is associated with some degree of instability. . . ." *Cervical Stenosis with Myelopathy*, SPINE-HEALTH, http://www.spine-health.com/conditions/spinal-stenosis/cervical-stenosis-myelopathy (last visited Feb. 5, 2015).

Based primarily on the lack of a firm diagnosis, the ALJ found Larson's symptoms of weakness, fatigue, and pain insufficient to render her disabled. The Commissioner argues that even considering Dr. Lippincott's diagnosis, the ALJ's decision was supported by substantial evidence. However, substantial evidence must support not only the ALJ's decision, but the Commissioner's final decision. For the purposes of judicial review, the evidence submitted to the Appeals Council is part of the "record as a whole" which the reviewing court must consider when reviewing the Commissioner's final decision for substantial evidence. *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F3d 1157, 1163 (9th Cir 2012) (citation omitted).

Until the December 2012 MRI, the ALJ had no objective medical evidence to explain Larson's symptoms and rejected them largely as somatic. However, her symptoms were finally substantiated by Dr. Lippincott's uncontroverted diagnosis in January 2013 as caused by the severe neurological impairment of cervical myelopathy, as well as degenerative disk disease. Unfortunately, the Appeals Council denied review despite that diagnosis. Even if this diagnosis is merely a new label for Larson's symptoms, as the Commissioner contends, it nonetheless constitutes objective medical evidence which the ALJ found lacking, and, as discussed below, renders many of the ALJ's findings clearly erroneous.

I.    <u>**Step Two Impairment**</u>

At step two, the ALJ found that Larson had several severe impairments, including a somatoform disorder, but other impairments, "including fibromyalgia, lumbago, bipolar disorder, and post-polio syndrome/multiple sclerosis," to be non-severe based on "the lack of specific

diagnoses, the unremarkable objective findings and the minimal treatment involved." Tr. 15.

Larson challenges this finding because it omitted the severe impairment of cervical myelopathy.

At the time of his decision, most of the non-severe impairments had been mentioned at

one time or another by Larson's medical providers as possible, but unconfirmed, causes of her

symptoms.  Tr. 302, 316 (fibromyalgia), 342 (postpolio syndrome), 566 (rheumatologic

problems), 571 (multiple sclerosis).  However, once Dr. Lippincott made a definitive

neurological diagnosis, the ALJ's listing of severe impairments at step two was rendered

incomplete.  Nonetheless, the inquiry at step two "is a *de minimis* screening device to dispose

of groundless claims."  *Smolen v. Chater*, 80 F3d 1273, 1290 (9th Cir 1996) (citation

omitted).  Since the ALJ proceeded to address Larson's alleged symptoms, even without a

definitive diagnosis, through step five, any error at step two was harmless.

## II.    <u>Step Three Listing Determination</u>

### A.    <u>Somatoform Disorder</u>

Larson argues that the ALJ failed to analyze her severe impairment of somatoform

disorder under Listing 12.07 in 20 CFR Part 404, Subpart P, Appendix 1.  However, the ALJ

considered the severity of all Larson's mental impairments under both Listings 12.04 and

12.07.  Tr. 16.  Finding that Larson had only a mild restriction in activities of daily living,

moderate difficulties in social functioning, moderate difficulties in concentration,

persistence, or pace, and has experienced not episodes of decompensation, the ALJ

concluded that the paragraph B criteria were not satisfied.  Tr. 16–17.  Because Larson has

failed to present evidence that she meets the criteria of paragraph B or C, the ALJ did not

err by finding that neither Larson's major depressive disorder nor her somatoform disorder

met the criteria in Listings 12.04 or 12.07.

**B.**    **Disorders of the Spine**

Larson also argues that the ALJ erred by failing to find that her impairments, either alone or in combination, equal the severity of Listing 1.04 for disorders of the spine.  The ALJ did consider "all of the neurological listings under 11.00," but found that Larson's "headache symptoms do not rise to meeting or equaling any of them because a neurological examination did not reveal any significant findings."  Tr. 16.

Listing 1.04 includes disorders of the spine ("e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture") "resulting in compromise of a nerve root . . . or the spinal cord" with:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);or
>
> B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C.  Lumbar spinal stenosis resulting in pseudoclaudication,[7] established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 CFR Part 404, Subpart P, Appendix 1.

Dr. Lippincott's January 2013 diagnosis falls within the disorders of the spine covered by Listing 1.04.  However "[t]he mere diagnosis of an impairment listed in

---

[7]  Pseudoclaudiation is "painful cramps that are not caused by peripheral artery disease but rather by spinal, neurologic, or orthopedic disorders, such as spinal stenosis, diabetic neuropathy, or arthritis."  http://medical-dictionary.thefreedictionary.com/ pseudoclaudication (last visited Feb. 5, 2015)/

Appendix 1 is not sufficient to sustain a finding of disability." *Key v. Heckler*, 754 F2d 1545, 1549 (9th Cir 1985). "'It must also have the *findings* shown in the Listing of that impairment.'" *Id*, quoting 20 CFR § 404.1520(d).

The December 19, 2012 MRI shows some of the findings listed in Subpart A of Listing 1.04. First, the MRI showed moderate spinal stenosis (at C5-6 and C6-7) resulting in the flattening of the cervical cord, which Dr. Lippincott identified as cervical myelopathy. Tr. 570–71. The Commissioner argues that this finding does not meet Listing 1.04 because there was no abnormal signal in the cord and Dr. Lippincott explained that Larson was not putting herself at significant risk by foregoing surgery at this time. Tr. 570. However, "compromise of a nerve root . . . or the spinal cord" required by Listing 1.04 is not defined as requiring an abnormal signal, and nothing in the regulations indicates that flattening is insufficient to meet this listing.

Second, Larson's difficulty with walking may meet Subpart A's requirement of "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss." The Commissioner argues that Dr. Lippincott's January 13, 2013 examination found normal muscle tone, strength in all extremities, and deep tendon reflexes equal bilaterally. Tr. 570. However, that examination also revealed that Larson's "gait is slightly broad-based, she "[h]as difficulty with tandem walking," is "always in Romberg position," and has "some mild clumsiness with both finger-nose-finger and heel-to-shin testing, and actually more pronounced in the arms." *Id.* Dr. Lippincott also explained that a diagnosis of cervical stenosis with myelopathy based on the MRI was supported by Larson's symptoms of "4-limb clumsiness and gait instability." Tr. 571. He further indicated that

Larson's stenosis would continue to "progress and as it does so, she will become more symptomatic and likely more compelled to seek surgical treatment."  *Id.*

With the benefit of Dr. Lippincott's January 2013 diagnosis, the Commissioner should have considered whether Larson's combined impairments meet Listing 1.04 and, if so, at what point in time.  That failure constitutes error.

## III.    Credibility Determination

Larson argues that the ALJ erred by finding that her statements "concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with" her RFC.  Tr. 18.

### A.    Larson's Testimony

At the hearing, Larson testified that the symptom most interfering with her physical ability to work is weakness in her legs.  Tr. 48.  Several times a week, her legs will start shaking and then suddenly stop working and collapse.  Tr. 48–49.  She does not go anywhere without a cane.  Tr. 49.  These episodes of weakness occur if she walks a block, is tired, or feels emotionally stressed.  Tr. 74.  At times, her arms and hands also shake. Tr. 74.  She also suffers occasional pain in the form of muscle spasms in her legs and back for which she takes pain medications.  Tr. 49–50, 74.  In addition, she suffers weekly migraine headaches for which she takes medication as needed.  Tr. 50-51.  She also has memory and concentration problems.  Tr. 50, 77.

On a typical day, she sits, reads, and watches TV.  Tr. 65, 75.  She leaves the house only once or twice a week.  Tr. 39.  She drives as little as possible and is usually driven by her daughter or husband.  Tr. 38–39.

18 - FINDINGS AND RECOMMENDATION

In her written report, she stated that she used to be very physically active (working, skiing, hiking, and swimming), but now has only the strength to read and rarely leaves home.  Tr. 195, 198.  Her activities are limited to doing some daily house cleaning with help from her daughter, doing laundry twice a week, feeding her cats, occasionally preparing meals, going out by car a few days a week, shopping for food or clothes about once a week, and going to church once a week.  Tr. 191–98.

**B.**     **Legal Standards**

The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345–46 (9th Cir 1991) (*en banc*).  A general assertion that the plaintiff is not credible is insufficient; the ALJ "must state which [subjective symptom] testimony is not credible and what evidence suggests the complaints are not credible."  *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993).  The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant. *Id.*

The ALJ must consider all symptoms and pain which "can be reasonably accepted as consistent with the objective medical evidence and other evidence."  20 CFR § 404.1529(a). Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for finding a claimant not credible. *Lingenfelter*, 504 F3d at 1036, citing *Smolen*, 80 F3d at 1281.  This standard "is the most demanding required in Social Security cases."  *Moore v. Comm'r of the Soc. Sec. Admin.*,

19 - FINDINGS AND RECOMMENDATION

278 F3d 920, 924 (9th Cir 2002).  Examples of clear and convincing reasons include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistent statements, daily activities inconsistent with the alleged symptoms, a sparse work history, or testimony that is vague or less than candid.  *Tommasetti*, 533 F3d at 1040.

Credibility determinations are within the province of the ALJ.  *Fair v. Bowen*, 885 F2d 597, 604 (9th Cir 1989), citing *Russell v. Bowen*, 856 F2d 81, 83 (9th Cir 1988).  Where the ALJ has made specific findings justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by substantial evidence in the record, the role of the reviewing court is not to second-guess that decision.  *Id.*

### C.    Analysis

With no evidence of malingering, the ALJ was required to provide clear and convincing reasons for rejecting Larson's testimony.  The ALJ rejected her testimony because:  (1) her subjective complaints were "not reasonably consistent with the medical evidence;" (2) she was non-compliant with a medical recommendation; (3) she showed some improvement; (4) she had an inconsistent work history; and (5) she can perform a full range of daily activities.  Tr. 18–19.  Most of these reasons are not clear and convincing.

In support of his first reason, the ALJ cited medical evidence that Larson's depression was controlled by medication (Tr. 314), that psychological evaluations in 2009 (Tr. 411-15 by Dr. Prescott) and 2010 (Tr. 445)[8] showed "good cognition and memory," that all of her symptoms had improved as of July 2007 (Tr. 318), that an examination of her lumbar spine was normal (Tr. 274-75), that she would have less fatigue in her lower extremities if she lost weight (Tr. 275, 355), and that the brain MRI did not show evidence

---

[8] For the 2010 psychological evaluation, the ALJ cited only to Dr. Torguson's chart note.

20 - FINDINGS AND RECOMMENDATION

of acute ischemia or other explanations for her headaches (Tr. 544). Tr. 18. However, the ALJ mischaracterized most of this medical evidence.

First, the December 2, 2007 report regarding control of Larson's depression by medication also states that Larson was feeling better *until* she had a relapse due to stress. Tr. 314. Second, in the December 31, 2008 psychological evaluation, Dr. Prescott reported that Larson denied "any mental health factors affecting her health," but also confirmed that Larson suffered from depression and fit the "profile for a Somatoform disorder called neurasthenia," because of "her blanket denial of psychological factors." Tr. 414. Third, although Dr. Torguson stated on January 30, 2009, and again on June 14, 2010, that Larson's cognition and memory seem good based his examination, he did no testing either time. Tr. 445, 512–13. In contrast, Dr. Prescott's testing found that Larson "showed some impairment with concentration." Tr. 413. Fourth, although Dr. Torguson did report that Larson's symptoms were "much better" on July 2007 (Tr. 318), other medical records by him and other providers report that those same symptoms waxed and waned (Tr. 559, 576) and worsened over the next few years. Tr. 571. Fifth, despite the normal examination and no evidence of radiculopathy on April 8, 2008, Dr. Phillips also reported that Larson "does have easy fatigue in her lower extremities." Tr. 275. Although he noted that her extra weight "can" contribute to that fatigue, he diagnosed her with suffering the "late effects of polio (post polio syndrome)" which was apparent because "she is aging." Tr. 275, 355. Larson did report to Dr. Perry, on June 7, 2011 that "nothing in particular worsens the pain," but also said that "it is just random." Tr. 544.

Notably, the ALJ failed to acknowledge that none of the treating and examining physicians found Larson to be anything other than credible. Tr. 414 (Dr. Prescott), 547

(Dr. Perry), 557 (Dr. Phillips), 541 (Dr. Torguson).  Instead, the ALJ appeared to be swayed by the lack of any definitive diagnosis to explain her symptoms.

The ALJ's second reason is equally unconvincing.  As evidence of Larson's noncompliance "which could have impeded her progress," the ALJ cited to her desire in November 2008 not to undergo a suggested D&C (dilation and curettage) and hysteroscopy to evaluate an endometrial lesion.  Tr. 468.  Not only does that procedure bear no relevance to her allegedly disabling symptoms, but her desire to avoid it is reasonable given that, as she explained that same day, she "might be losing her insurance soon."  Tr. 467.  The record reveals no other incidences of Larson failing to comply with medical recommendations.

As to showing "some improvement," the ALJ correctly cited a July 1, 2008 chart note reporting improvement in her migraine headaches after physical therapy.  Tr. 348.  However, her more limiting symptoms were largely unresponsive to medication.  Cymbalta caused more muscle weakness (Tr. 349), and Flexeril and muscle relaxers were ineffective at treating her pain and muscle spasms.  Tr. 512.  The ALJ also cited a September 26, 2009 chart note by Dr. Torguson reporting the benefits of prednisone burst.  Tr. 458–59.  However, the ALJ omitted other statements by Dr. Torguson that the prednisone was a one-week diagnostic test that was not repeated, that Larson "started to regress backwards days after she stopped the prednisone" and that, as a result, she "needs a good neurologist and this is somewhat impossible without insurance."  *Id*.  Dr. Torguson surmised on January 12, 2010, that her positive response to prednisone possibly indicated "some type of autoimmune disorder."  Tr. 514.

As his fourth reason to discredit Larson, the ALJ cited "an inconsistent work history, which raises a question as to whether [her] continuing unemployment is actually due to

22 - FINDINGS AND RECOMMENDATION

medical impairments." Tr. 18.  Although he cited the portion of the record containing her

work history, he failed to explain how her work history was inconsistent.  In fact, she

worked continuously from 1997 through 2007 with her highest earnings in 2004 and 2006.

Tr. 150–51.  She also explained that in 2005, she had to take medical leave for three months

and could no longer work full-time when she returned, and that she had to quit in 2007

because she could longer work safely.  Tr. 162, 543.  Nothing in the record supports any

desire by Larson to avoid working.  To the contrary, she repeatedly expressed her desire to

return to work.  Tr. 306, 317–18, 385, 412.

Finally, the ALJ found that Larson could perform a full range of daily activities that

conflict with her allegedly disabling limitations.  Tr. 19.  However, performing the activities

she described would not be inconsistent with the clear evidence that her waxing and waning

symptoms result in good and bad days.  Tr. 559, 576.  None of her reported activities are the

same type or duration as work-like activities.

Thus, the ALJ failed to provide clear and convincing reasons to discredit Larson.

## IV.    Medical Opinions

Larson argues that the ALJ's reasons for rejecting the opinions of her treating

physicians, Dr. Torguson and Dr. Phillips, were not legitimate.

Uncontradicted opinions of treating or examining sources may be rejected for clear

and convincing reasons, while contradicted opinions may be rejected for specific and

legitimate reasons.  *Bayliss v. Barnhart*, 427 F3d 1211, 1216 (9th Cir 2005).  The

Commissioner contends that the lower specific and legitimate standard applies because the

opinions of Drs. Pritchard and Eder contradict those of Drs. Torguson and Phillips.  Tr. 459,

526, 541.  However, those conflicting opinions by reviewing physicians are not sufficient to

reject a treating physician's opinion. The opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician. *Lester v. Chater*, 81 F3d 821, 831 (9th Cir 1995) (citations omitted). Thus, the clear and convincing standard applies.

### A.    Dr. Torguson

Dr. Torguson has been Larson's primary care physician since 2008. Tr. 541. He submitted several opinions regarding Larson's functional capacity consistent with a disability. In September 2009, he opined that: "There is no doubt in my mind that the patient is disabled, either physically or psychiatrically or both at this point." Tr. 459. He completed a medical source statement in August 2010 stating, among other limitations, that Larson's generalized motor weakness would limit her to standing for only 15 minutes at one time and one hour during an eight-hour workday, and that she "can't work at all." Tr. 526–27. In April 2011, Dr. Torguson submitted a letter stating that Larson "appears to have a neurological problem," has "referred her to a neurologist for further testing and diagnosis," but, to his knowledge, "there has still been no firm diagnosis of any specific condition made." Tr. 541. He concluded that Larson was unable to work more than two hours per day. *Id*. In July 2011, Dr. Torguson stated that the more Larson exerted herself, the more her ability to function decreased. Tr. 559.

The ALJ gave these opinions "little weight." Tr. 20–21. He found that the 2009 opinion conflicted with his treatment note during that visit which showed that Larson had full muscle strength in her lower extremities and significant improvement with medication Tr. 20, 459. He found that Dr. Torguson's 2010 opinion was devoid of substantiating documentation, did not "provide any specific diagnosis" to explain Larson's symptoms, and

24 - FINDINGS AND RECOMMENDATION

conflicted with the finding of consultative examiner, Dr. Perry, that Larson had no atrophy

or problems with gripping or manipulating objects with her hands.  Tr. 21, 526, 547.

Dr. Torguson admitted in his April 2011 opinion that there was no firm diagnosis, that

Larson's potential neurological condition was outside the scope of his expertise, and that

her complaints were subjective and likely based on a psychological factor.  Tr. 21, 541.

However, the ALJ did not have the benefit of the January 2013 diagnosis by

Dr. Lippincott, a neurologist, which fully supports Dr. Torguson's opinions.  "The opinions

of a specialist about medical issues related to his or her area of specialization are given

more weight than the opinions of a nonspecialist."  *Smolen*, 80 F3d at 1285; 20 CFR

§ 404.1527(c)(5).  Dr. Lippincott's diagnosis is especially persuasive because he has a

history of treating Larson.  In January 2008, Dr. Blumenstein noted that that past medical

records (not part of the record) indicated that at some earlier time, Dr. Lippincott had

assessed Larson's condition as possibly neurological, such as transverse myelitis or viral

leukoencephalitis.  Tr. 306.  Therefore, the ALJ's reasons for discounting Dr. Torguson's

opinions were not legally sufficient.

### B.    Dr. Phillips

In April 2009, after a year of treating Larson, Dr. Phillips completed a Medical

Statement Regarding Postpolio Syndrome.  Tr. 509–10.  He stated that Larson could work

only one hour during an eight-hour workday, with no standing, two hours of sitting at one

time, and four hours of sitting total in a workday.  Tr. 509–10.  The ALJ gave this opinion

no weight because the limitations it endorsed were "subjectively based on [Larson's]

reporting her symptoms."  Tr. 21.  He added that:  "As explained through this decision,

[Larson's] pain/muscle complaints do not correspond to any specific diagnosis; on this

basis, it is apparent that Dr. Phillips'[s] assessment is speculative at best." Tr. 21–22. He also cited Dr. Phillips's admission that "he cannot really find what is wrong with her." Tr. 22. However, based on Dr. Lippincott's later diagnosis submitted to the Appeals Council, Larson's pain and muscle complaints do correspond to a specific diagnosis, thus undermining the ALJ's reasoning.

The ALJ also rejected Dr. Phillips's opinion because "the State assessments did not find any exertional limitations and the mental restrictions were no more than moderate, which is inconsistent with these findings." Tr. 22. One such "State assessment" was performed by Dr. Perry on June 7, 2011, without the benefit of the later diagnosis of cervical stenosis with myelopathy and based on only a 40-minute examination. Tr. 543–48. Notably, he did find one exertional limitation, namely Larson had "occasional giving away of one of the lower extremities." Tr. 545–56. She "did not fall completely, but did stumble," and uses a cane which he found "medically necessary based on objective findings for stability for all distances and terrain." Tr. 546. Thus, it is unclear whether Dr. Perry's opinion is inconsistent with Dr. Phillips's opinion. The remaining consulting physicians, Drs. Pritchard and Eber, based their conclusions only on a review of the record, but not on Dr. Lippincott's diagnosis. Tr. 443, 457.

In sum, the ALJ's evaluation of Dr. Phillips's opinion was not supported by substantial evidence.

## V.    Lay Witness Testimony

Larson argues that the ALJ erred in discounting the observations of her family members who submitted statements into the record.

Mikal Finan, Larson's daughter, stated that Larson's understanding, memory, and concentration were affected by her impairments, that she experienced fatigue that interfered with movement, and that her condition had declined through the years to the point that she could not work at any job. Tr. 183–90, 249–50. Brooke Henderson, Larson's niece, reported that Larson's condition declined to the point where she was "barely able to leave the house" and needed a cane to ambulate. Tr. 246. Tamara Campanile, Larson's sister, reported that Larson was no longer able to engage in former sporting activities, had no energy or strength, used a cane, had a short memory, and was in pain all the time. Tr. 247–48. Larson's mother, Regina Larson, stated that Larson had headaches, fatigue, weakness, and pain. Tr. 251–53. Michael Finan, Larson's husband, reported that Larson's condition declined to the point that she could no longer walk without the use of a cane. Tr. 260–62.

The ALJ "strongly considered these reports," but rejected them because "the underlying cause of [Larson's] complaints has not been determined. No definitive diagnosis exists." Tr. 19. He also noted that some reports conflicted with Dr. Perry's evaluation. *Id.* He added "that it is not clear how often these individuals saw and observed [Larson]," that "it is possible some of them relied heavily on [her] subjective reporting," and that "any functional loss may indeed be the result of morbid obesity verses [*sic*] any speculative neurological disorder or childhood disease." Tr. 19-20.

Non-medical sources, such as family members, are defined as "other" sources under the regulations, 20 CFR § 404.1513(d)(4), and in rejecting testimony from other sources, the ALJ need only give "arguably germane reasons," and need "not clearly link his determination to those reasons." *Lewis v. Apfel*, 236 F3d 503, 512 (9th Cir 2001).

Based on the information that he had at the time, reliance on Larson's subjective reporting was a germane reason to reject any third-party reports not based on personal observations.  However, that reason derived primarily from the lack of a definitive diagnosis to explain Larson's loss of functioning.  As noted above, a definitive diagnosis was made after the ALJ issued his decision.  Based on that diagnosis, this reason for rejecting some of these third-party reports is not germane.

In addition, it is clear that some of these third-party reports are based on daily or frequent personal observations of Larson and an intimate understanding of her medical history.  Larson's daughter lived with her mother and father at least during 2011.  Tr. 544.  Both Larson's daughter and husband accompanied her physician's visits.  Tr. 321, 461, 466.  Finally, her mother has been following Larson's decline since she was born.  Tr. 389.

In light of these reasons, the ALJ's explanation for rejecting the third-party reports is not germane.

## VI.    __Remand__

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court.  *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir 2000).  The issue turns on the utility of further proceedings.  A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision.  *Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F3d 1135, 1138 (9th Cir 2011).  The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act.  *Id*.

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id*, quoting *Benecke v. Barnhart*, 379 F3d 587, 590 (9th Cir 2004). The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F3d 871, 876 (9th Cir 2003). The reviewing court declines to credit testimony when "an outstanding issue" remains. *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010).

As discussed above, the ALJ erred by failing to consider whether Larson's impairments meet Listing 1.04 and to provide legally sufficient reasons to reject Larson's testimony, witness statements, and the opinions of two physicians. However, these errors resulted largely from the fact that at the time of the hearing, the ALJ did not have the December 2012 MRI or Dr. Lippincott's diagnosis. Repeatedly in his decision, the ALJ noted the absence of any definitive diagnosis supported by objective findings as the cause of Larson's complaints, leading him to view them as more psychological than physical. Primarily for that reason, he gave little weight to Dr. Torguson's opinions supporting disability (Tr. 20) and "significant weight" to the February 14, 2008 opinion of Dr. Blumenstein that Larson has "multiple somatic complaints." Tr. 23, 382. With a definitive diagnosis, the ALJ's view of the record concerning Larson's physical and mental impairments is not supported by substantial evidence. If the opinions of Drs. Phillips and

Torguson are credited, substantial evidence in the record supports the conclusion that, due to her weakness, pain and fatigue, Larson cannot perform even sedentary work, which the ALJ offers as an alternative finding.  Tr. 24.  Both Dr. Phillips and Dr. Torguson found that she could not sit for an entire eight-hour workday.  Tr. 509–10, 526.  Even a further determination about whether Larson's condition meets Listing 1.04 is moot considering she cannot sustain sedentary work.  Thus, no outstanding issues remain to be decided, and this case should be remanded for an immediate award of benefits.

## RECOMMENDATION

For the reasons discussed above, the Commissioner's decision should be REVERSED AND REMANDED pursuant to sentence four of 42 USC §405(g) for an immediate award of benefits.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due Friday, March 06, 2015.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED February 17, 2015.


s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge


30 - FINDINGS AND RECOMMENDATION